UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                                                                     :

**MICHAEL HALL,**

                            Plaintiff,

                – against –

**THE CITY OF NEW YORK; CAPTAIN JERMAINE SLACK; DEPUTY IDI GUITY; FORMER C.O. NATASHA KEIZER; CAPTAIN ROBERT VENECHANOS; CAPTAIN TONY MONTAGUE; NANA ASARE, P.A.; CAPTAIN SAMANTHA BRYANT;** and **CORRECTION OFFICER ALPHA DIALLO,**

                            Defendants.

**MEMORANDUM DECISION AND ORDER**

22-CV-5738 (AMD) (MMH)

--------------------------------------------------------------- X

**ANN M. DONNELLY,** United States District Judge:

       The plaintiff brings this action against the City of New York and eight corrections and medical officers at Rikers Island, in connection with an assault by another inmate on September 23, 2021. Before the Court are the parties' cross-motions for summary judgment. For the following reasons, the plaintiff's motion is denied and the defendants' motion is granted.

## BACKGROUND[1]

### I.     Factual Background

       On September 23, 2021, the plaintiff, a pretrial detainee on Rikers Island, was transferred from the Robert N. Davoren Complex ("RNDC") to the Vernon C. Bain Center ("VCBC"). (ECF No. 70, Defendants' Rule 56.1 Statement ("Defs. 56.1") ¶¶ 3–4; ECF No. 71-5, Exhibit E,

---

[1] The factual background is based on the Court's review of the entire record, including the defendant's 56.1 statement. The plaintiff did not respond to the defendants' motion or file a Rule 56.1 statement. Nevertheless, the Court has considered the entire record, including the plaintiff's previous filings, in deciding these motions.

Hall Deposition ("Hall Dep.") at 80.)  Following intake at the VCBC, the plaintiff was taken to housing area 1BA, although he was "reject[ed]" upon arrival.  (ECF No. 70, Defs. 56.1 ¶ 5; ECF No. 71-6, Exhibit E, Hall Deposition Pt. 2 ("Hall Dep. Pt. 2") at 2–3.)  Corrections officers took the plaintiff to housing area 1BB, a dormitory-style section of the VCBC.  (ECF No. 70, Defs. 56.1 ¶ 6; ECF No. 71-6, Hall Dep. Pt. 2 at 2–3.)  The plaintiff walked into 1BB but left, with his belongings, and sat with another inmate in the vestibule.  (ECF No. 70, Defs. 56.1 ¶¶ 7–8; ECF No. 71-6, Hall Dep. Pt. 2 at 4–5.)

Captain Robert Venechanos and former Corrections Officer Natasha Keizer arrived and asked the plaintiff why he left the housing area.  (ECF No. 70, Defs. 56.1 ¶ 9; ECF No. 71-7, Exhibit F, Venechanos Body Camera Video 1 ("Venechanos Body Cam 1") at 00:00–00:14.)  The plaintiff replied, "[F]or the record, nobody [in 1BB] said anything to us, nobody tried to intimidate us."  (ECF No. 70, Defs. 56.1 ¶ 10; ECF No. 71-7, Venechanos Body Cam 1 at 00:05–00:12.)  He explained that he wanted to be placed in a housing area with individual cells; he believed that in "the dorm setting . . . the windows don't open, you have no foliage, you have no trees, you have no plants, so therefore the oxygen becomes stagnant."  (ECF No. 70, Defs. 56.1 ¶¶ 11–14; ECF No. 71-7, Venechanos Body Cam 1 at 00:14–02:41.)  He also said that he had "religious rights."  (ECF No. 70, Defs. 56.1 ¶ 14; ECF No. 71-7, Venechanos Body Cam 1 at 02:41–02:55.)  Captain Venechanos and Officer Keizer explained that there were no cell-styled housing areas available, and the plaintiff went back into 1BB.  (ECF No. 70, Defs. 56.1 ¶¶ 15–17; ECF No. 71-7, Venechanos Body Cam 1 at 07:04–09:07.)

After about five minutes, however, the plaintiff left again and sat in the vestibule.  (ECF No. 70, Defs. 56.1 ¶ 18; ECF No. 71-8, Exhibit G, Genetec Surveillance Video 1 ("Genetec Video 1") at 2:16:25–2:21:55.)  He repeated his concerns about air quality to Captain

Venechanos, Captain Tony Montague, and other officers. (ECF No. 70, Defs. 56.1 ¶ 19; ECF No. 71-9, Exhibit H, Venechanos Body Camera Video 2 ("Venechanos Body Cam 2") at 00:00–00:25.) When the plaintiff refused to go back inside, Captain Montague picked up the plaintiff's bags and moved them into the housing area; the plaintiff grabbed the bags and tried to drag them back into the vestibule. (ECF No. 70, Defs. 56.1 ¶ 20; ECF No. 71-9, Venechanos Body Cam 2 at 03:45–04:40.) Captains Montague and Venechanos called for a probe team, and the plaintiff went back into 1BB, where he stayed for about nine minutes. (ECF No. 70, Defs. 56.1 ¶¶ 21–22; ECF No. 71-8, Genetec Video 1 at 2:32:11–2:41:35; ECF No. 71-9, Venechanos Body Cam 2 at 04:52–05:00.) The plaintiff tried to leave 1BB when the probe team arrived, but Corrections Officer Michael Bushrod directed the plaintiff to "[m]ove back" and pushed him with his shield. (ECF No. 71-11, Exhibit J, Bushrod Use of Force Report ("Bushrod Report"); *see also* ECF No. 70, Defs. 56.1 ¶¶ 23–24; ECF No. 71-8, Genetec Video 1 at 2:41:09–2:41:36.) When the plaintiff walked out of 1BB again, officers tied his wrists with zip ties and took him to the VCBC clinic for evaluation. (ECF No. 70, Defs. 56.1 ¶¶ 25–26; ECF No. 71-10, Exhibit I, MVI 0995 Video ("MVI 995") at 01:20–01:52; ECF No. 71-12, Exhibit K, Genetec Surveillance Video 2 ("Genetec Video 2") at 07:22–07:35.) Doctor Okvunduh Okene examined the plaintiff, determined that he suffered "no visible injury" and discharged him. (ECF No. 71-13, Exhibit L, Okene Injury Report; *see also* ECF No. 70, Defs. 56.1 ¶ 27.)

The probe team took the plaintiff to a hallway outside the VCBC clinic, and an unidentified officer told the plaintiff that they "would try to work with" him but had to place him in a housing area. (ECF No. 71-14, Exhibit M, MVI 0997 Video ("MVI 997") at 02:24–02:49; *see also* ECF No. 70, Defs. 56.1 ¶¶ 28–29.) The plaintiff asked if there were gangs in the dorm-style housing areas, and stated that he had a right to be safe in jail. (ECF No. 70, Defs. 56.1

3

¶¶ 30, 32; ECF No. 71-14, MVI 997 at 02:55–03:13.)  The officer agreed the plaintiff had a right to be safe, and that there were gangs in every housing area.  (ECF No. 70, Defs. 56.1 ¶¶ 31–32; ECF No. 71-14, MVI 997 at 02:55–03:13.)  The officer asked if the plaintiff wanted to be placed in protective custody; the plaintiff said he wanted to be assigned to a cell.  (ECF No. 70, Defs. 56.1 ¶¶ 34–35; ECF No. 71-14, MVI 997 at 03:13–03:35.)  The officer told the plaintiff that the only available cell was in housing area 3CB and directed the probe team to take the plaintiff there.  (ECF No. 70, Defs. 56.1 ¶¶ 36–38; ECF No. 71-14, MVI 997 at 03:40–03:55.)  When the plaintiff objected, Deputy Idi Guity explained that the facility had limited availability and that officers were extending him a "courtesy" by putting him in a housing area that he requested. (ECF No. 70, Defs. 56.1 ¶¶ 40–42; ECF No. 71-14, MVI 997 at 04:10–05:05.)

When they arrived at housing area 3CB, Captain Jermaine Slack took the plaintiff to his cell.  (ECF No. 70, Defs. 56.1 ¶¶ 43–46; ECF No. 71-14, MVI 997 at 18:50–19:05; ECF No. 71-15, Exhibit N, Genetec Surveillance Video 3 ("Genetec Video 3") at 3:15:48-3:16:15.)[2]  As the plaintiff approached his cell, several inmates said that "he ain't got no mattress here."  (ECF No. 70, Defs. 56.1 ¶ 47; ECF No. 71-14, MVI 997 at 18:50–19:05.)  The probe team left the area once the plaintiff was in his cell with the door closed.  (ECF No. 70, Defs. 56.1 ¶¶ 50–51; ECF No. 71-15, Genetec Video 3 at 3:19:18–3:19:38.)  Shortly thereafter, another inmate brought a mattress to the plaintiff's cell.  (ECF No. 70, Defs. 56.1 ¶ 52; ECF No. 71-15, Genetec Video 3 at 3:24:10–3:24:20.)  As the cell door opened, a group of inmates crowded in front of the cell while one inmate went in and hit the plaintiff in the head.  (ECF No. 70, Defs. 56.1 ¶¶ 53–55;

---

[2] The plaintiff testified at his deposition that he "tried" to tell an officer that he "shouldn't be" placed in 3CB, but this statement is not on the video.  (ECF No. 70, Defs. 56.1 ¶ 48; ECF No. 71-6, Hall Dep. Pt. 2 at 13.)

4

ECF No. 71-15, Genetec Video 3 at 3:24:20–3:24:35.)[3]  Immediately after the attack, an officer pushed past the crowd and the assailant left the cell.  (ECF No. 70, Defs. 56.1 ¶¶ 57–58; ECF No. 71-15, Genetec Video 3 at 3:24:25–3:24:40.)  The officer stood outside the cell and the inmates left the area.  (ECF No. 71-15, Genetec Video 3 at 3:24:40–3:25:50.)

Two minutes later, the probe team returned and took the plaintiff, with his belongings, to the VCBC clinic, where Physician Assistant Nana Asare treated him.  (ECF No. 70, Defs. 56.1 ¶¶ 60–61, 69; ECF No. 71-15, Genetec Video 3 at 3:27:40–3:28:50; ECF No. 71-16, Exhibit O, Asare Injury Report 1; ECF No. 71-17, Exhibit P, Asare Injury Report 2.)  The plaintiff was not seriously injured; he had a cut on his head, but was alert.  (ECF No. 70, Defs. 56.1 ¶¶ 73–74; ECF No. 71-16, Asare Injury Report 1 at 2; ECF No. 71-17, Asare Injury Report 2 at 2–4.)  PA Asare treated the plaintiff with a cold pack, hydrogen peroxide, acetaminophen, and a band aid.  (ECF No. 70, Defs. 56.1 ¶ 75; ECF No. 71-16, Asare Injury Report 1 at 2.)  Officers then took the plaintiff to a different housing area.  (ECF No. 70, Defs. 56.1 ¶ 76.)  Doctors did not do a CAT scan, MRI, X-Ray, or other assessment of the plaintiff's brain or head.  (ECF No. 70, Defs. 56.1 ¶ 80; ECF No. 71-6, Hall Dep. Pt. 2 at 44–45.)[4]

## II. Procedural Background

On September 22, 2022, the plaintiff filed a complaint against the New York City Department of Corrections.  (ECF No. 1.)[5]  On January 13, 2023, the plaintiff filed an amended complaint against the City of New York (ECF No. 5), which was further amended pursuant to

---

[3] The attack was not captured on the surveillance video because the camera did not film the plaintiff's cell.  (ECF No. 70, Defs. 56.1 ¶ 55; ECF No. 71-15, Genetec Video 3 at 3:24:25–3:24:40.)

[4] The plaintiff testified at his deposition that he has headaches and vision impairment, but traced those symptoms to a July 2023 incident in which he hit his head on a table at a Chipotle restaurant.  (ECF No. 70, Defs. 56.1 ¶¶ 81–83; ECF No. 71-5, Hall Dep. at 9–13.)

[5] The Court dismissed the plaintiff's first complaint under 28 U.S.C. § 1915(e)(2)(B), (ECF No. 4).

*Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), to name Captain Slack, Deputy Guity, Officer Keizer, Captain Venechanos, Captain Montague, PA Asare, Captain Samantha Bryant, and Correction Officer Alpha Diallo as defendants (ECF Nos. 20, 23, 32).

The plaintiff moved for summary judgment on December 5, 2024 (ECF No. 68), and the defendants cross-moved for summary judgment the next day, (ECF No. 69).[6] The defendants responded to the plaintiff's motion. (ECF No. 76.) The plaintiff filed a one-page "affirmation," (ECF No. 78), which the Court construes as his opposition brief.

## LEGAL STANDARD

Summary judgment is appropriate if the parties' submissions — including pleadings, deposition transcripts, affidavits, and other material in the record — show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant has the burden of demonstrating that no material fact is genuinely in dispute. *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020). "A fact is material if it might affect the outcome of the suit under the governing law," and a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v.*

---

[6] Local Rule 56.2 provides that a party moving for summary judgment against a *pro se* litigant must "serve and file as a separate document, together with the papers in support of the motion, [a] 'Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment' with the full texts of Fed. R. Civ. P. 56 and Local Civil Rule 56.1 attached." In conjunction with their motion, the defendants filed an affidavit of service which stated that they served the plaintiff with the Local Rule 56.2 notice by mail. (ECF No. 74.) However, the defendants did not separately file that notice to the docket. The Court has considered whether to deny the motion for failure to file the notice separately and concludes under these circumstances that it is unwarranted. The defendants served the notice by mail at the plaintiff's address of record. Moreover, the defendant filed and served the Local Rule 56.2 notice in connection with their summary judgment motion in another of the plaintiff's lawsuits, which was proceeding along the same timeline as this case. *See Hall v. City of New York, et al.*, 23-CV-1787, ECF No. 50 (E.D.N.Y. Dec. 12, 2024). On these facts, the Court is satisfied that the plaintiff was given the necessary notice.

6

*City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Summary judgment is appropriate only if "on the record presented, considered in the light most favorable to the non-moving party, no reasonable fact-finder could find in its favor." *Roberts v. Genting N.Y. LLC*, 68 F.4th 81, 88 (2d Cir. 2023) (alterations adopted) (quoting *Capobianco v. City of N.Y.*, 422 F.3d 47, 54–55 (2d Cir. 2005)). A court should not ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded fact-finder could return a verdict for the non-moving party on the evidence presented." *Id.* (alterations adopted) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

"Cross-motions for summary judgment do not alter the basic standard." *Basora v. City of Poughkeepsie*, No. 22-CV-3300, 2025 WL 50322, at *3 (S.D.N.Y. Jan. 8, 2025). "When both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Roberts*, 68 F.4th at 88 (2d Cir. 2023) (cleaned up) (quoting *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)); *see also Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) ("The fact that both sides have moved for summary judgment does not guarantee that there is no material issue of fact to be tried and that one side or the other is entitled to that relief."). Where, as here, the parties have cross-moved for summary judgment, the Court evaluates each party's motion "on its own merits," and draws all reasonable inferences "against the party whose motion is under consideration." *Roberts*, 68 F.4th at 88 (quoting *Morales*, 249 F.3d at 121). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The Court affords "special solicitude" to *pro se* litigants who are "confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), and "liberal[ly] constru[es] their pleadings . . . to raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (internal quotations and citation omitted). However, "proceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by [evidence] are insufficient to overcome a motion for summary judgment." *Leon v. Dep't of Educ.*, No. 10-CV-2725, 2017 WL 6729676, at *4 (E.D.N.Y. Sept. 29, 2017), *aff'd sub nom. Leon v. New York City Dep't of Educ.*, 740 F. App'x 759 (2d Cir. 2018) (internal citations omitted).

## DISCUSSION

Both parties move for summary judgment. The defendant claims that summary judgment is warranted because "no reasonable juror could find that Plaintiff suffered a constitutional deprivation at the hands of the City or the individual defendants." (ECF No. 72 at 9.) The plaintiff also moves for summary judgment, although it is difficult to identify precisely what he is claiming. (*See* ECF Nos. 5, 68.) The Court construes the plaintiff's submissions liberally to raise claims for deliberate indifference to safety, deliberate indifference of medical needs, and interference with access to courts against the individual defendants, as well as a *Monell* claim against the City.[7] For the reasons that follow, the Court grants the defendants' motion and denies the plaintiff's motion.

---

[7] The plaintiff maintains that the defendants have not complied with their discovery obligations and did not preserve certain surveillance footage. (ECF No. 68 at 1–4.) The plaintiff raised these claims before Magistrate Judge Marcia M. Henry, who did not find that the defendants violated their discovery obligations. (*See* ECF Nos. 64, 65, 67.)

8

I.  **Deliberate Indifference to Safety**

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted). "To state a claim of deliberate indifference under the Due Process Clause of the Fourteenth Amendment, a plaintiff must allege both (a) conditions that objectively pose an unreasonable risk of serious damage to health; and (b) that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Vega v. Semple*, 963 F.3d 259, 273–74 (2d Cir. 2020) (cleaned up)

The plaintiff cannot satisfy either prong. The Second Circuit has explained that there "is no 'static test' to determine whether" a sufficiently serious harm existed. *Darnell*, 849 F.3d at 30 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). While a "prison official's failure to intervene in an attack may under certain circumstances create a condition which poses a substantial risk of serious harm," the "focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of" that risk. *House v. City of New York*, No. 18-CV-6693, 2020 WL 6891830, at *11 (S.D.N.Y. Nov. 24, 2020). Such a risk "can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker," though these conditions are not required. *Luckey v. Jonas*, No. 18-CV-8103, 2019 WL 4194297, at *4 (S.D.N.Y. Sept. 4, 2019) (citations omitted). Additionally, injuries that are sufficiently severe can satisfy this prong, in and of themselves. *House*, 2020 WL 6891830, at *13 (citing *Knowles v. New York City Dep't of Corr.*, 904 F. Supp.

9

217, 221 (S.D.N.Y. 1995)).  Under that theory, a plaintiff must show that "(1) he sustained serious injuries as a result of an altercation with other inmates and (2) the prisoner was the victim of an undisputedly unprovoked attack."  *Gordon v. Drummond*, No. 19-CV-8405, 2022 WL 884971, at *4 (S.D.N.Y. Mar. 25, 2022) (cleaned up).

      The record establishes that the plaintiff did not face "conditions that objectively pose an unreasonable risk to" his safety.  *Vega*, 963 F.3d at 273–74.  Although another inmate attacked the plaintiff, there is no evidence that the defendants should have known that the inmate posed a danger to the plaintiff; there is, for example, no evidence of other disputes between the assailant and the plaintiff, nor did the plaintiff alert the defendants that he was afraid of the other inmate.  In fact, the plaintiff declined an officer's offer to put him in protective custody.  (ECF No. 70, Defs. 56.1 ¶¶ 34–35; ECF No. 71-14, MVI 997 at 03:13–03:35.)  Nor was the plaintiff's injury — an abrasion to the side of his head — severe enough to create a substantial risk of harm.  *See Jimenez v. Lashley*, No. 23-CV-628, 2024 WL 4932554, at *5 (S.D.N.Y. Dec. 2, 2024) ("The Court does not believe that an isolated incident of a single strike . . . created a substantial risk of harm that . . . [qualifies as] sufficiently serious[].").

      Similarly, there is no evidence that the defendants were deliberately indifferent to a risk of serious harm.  Nothing in the record establishes that the defendants had any notice that an attack was imminent.  "Absent clear notice of a risk of harm to the prisoner, 'courts routinely deny deliberate indifference claims based upon surprise attacks.'"  *Fernandez v. New York City Dep't of Corr.*, No. 08-CV-4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010) (alteration incorporated) (quoting *Zimmerman v. Macomber,* No. 95-CV-882, 2001 WL 946383, at * 5 (S.D.N.Y. Aug.21, 2001)); *see also Edwards v. Black*, 854 F. App'x 382, 384 (2d Cir. 2021)

10

("Prison officials are not deliberately indifferent when they fail to act on stale or vague threats of inmate attacks.").

As explained above, the plaintiff did not tell the defendants that he was afraid of particular inmates or that he thought he could be attacked. While the plaintiff told an officer that he had a right to be safe — a statement with which the officers agreed — he did not alert any officer to a particular risk or a specific inmate. (ECF No. 70, Defs. 56.1 ¶¶ 30–32; ECF No. 71-14, MVI 997 at 02:55–03:13.) Nor did the plaintiff's other complaints — about the unhealthy environment in housing area 1BB or a general concern about gangs — put the defendants on notice of an unreasonable risk to his safety. (ECF No. 70, Defs. 56.1 ¶¶ 10–14, 30–32; ECF No. 71-7, Venechanos Body Cam 1 at 00:04–02:55; ECF No. 71-14, MVI 997 at 02:55–03:13.) That the defendant was the unfortunate victim of a surprise attack does not support a deliberate indifference claim. *See Fernandez*, 2010 WL 1222017, at \*4.

Courts also dismiss deliberate indifference claims where prison officials were not present or otherwise incapable of intervening to stop an attack on an inmate. *Brown v. Annucci*, No. 19-CV-9048, 2021 WL 860189, at \*5 (S.D.N.Y. Mar. 8, 2021) (dismissing deliberate indifference claim where the plaintiff failed "plausibly to allege [that the defendants] were personally involved in the alleged assault or were deliberately indifferent to a serious risk that plaintiff would be harmed by correction officers."). In this case, seven of the individual defendants — Deputy Guity, Officer Keizer, PA Asare, and Captains Venechanos, Montague, Slack, and Bryant — were not present when the plaintiff was attacked (ECF No. 72 at 19–23), and not in a position to intervene in the attack. These defendants had no personal involvement; thus, the deliberate indifference claim must be dismissed against them. *See Brown*, 2021 WL 860189, at \*5.

11

Only one defendant — Officer Diallo — was in the area at the time of the attack, and apparently opened the cell door when an inmate approached with a mattress. (ECF No. 72.) But nothing in the record supports a finding that Officer Diallo knew or should have known that the attack was imminent. (*See* ECF No. 70, Defs. 56.1 ¶¶ 47, 50–51; ECF No. 71-15, Genetec Video 3 at 3:19:18–3:24:30.) Accordingly, the defendants are entitled to summary judgment on the plaintiff's claim for deliberate indifference to his safety.[8]

## II.     Deliberate Indifference to Medical Needs

The plaintiff's claim for deliberate indifference to medical needs also arises under the Fourteenth Amendment. *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019). For this claim, the plaintiff "must meet two requirements: (1) that [he] had a serious medical need . . . and (2) that the Defendants acted with deliberate indifference to such needs." *Id.* (citations omitted). To "determine[e] whether a medical need is sufficiently serious," courts consider "factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." *Id.* (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). "[B]ruises, lacerations, cuts, black eyes, and other superficial injuries are 'not sufficiently serious to support' a deliberate indifference claim." *Morehouse v. Vasquez*, No. 17-CV-4836, 2020 WL 1049943, at *18 (S.D.N.Y. Mar. 4, 2020) (collecting cases).

---

[8] The plaintiff also argues that "Rikers Island is NOTORIOUS for Official Misconduct towards Detainees," and cites publicly reported instances of violence, as well as legal actions against Rikers Island and corrections officers. (ECF No. 68 at 5–7.) However, public reports and lawsuits did not put the defendants on notice that the plaintiff was at particular risk of attack.

12

As for the second prong, "mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act that evinces a conscious disregard of a substantial risk of serious harm." *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000) (cleaned up). In other words, the plaintiff must show "that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Charles*, 925 F.3d at 87 (emphases in original). "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference," the Second Circuit "has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (citations omitted).

The record reflects that the plaintiff's only injury was an abrasion on his head, which is not a serious medical condition. *See Morehouse*, 2020 WL 1049943, at *18. Even if the Court were to credit the plaintiff's unsubstantiated assertions that he suffered a concussion and nosebleed after PA Asare discharged him (ECF No. 68 at 4–5), he does not assert that he suffered any lasting symptoms or damage. (ECF No. 70, Defs. 56.1 ¶¶ 81–83; ECF No. 71-5, Hall Dep. at 9–13.) Nor does the record show that the defendants were deliberately indifferent to the plaintiff's injuries; almost immediately after the attack the probe team returned and took the plaintiff to the VCBC clinic for evaluation and treatment. (ECF No. 70, Defs. 56.1 ¶ 69; ECF No. 71-16, Asare Injury Report 1 at 2; ECF No. 71-17, Asare Injury Report 2 at 2–4; ECF No. 72

at 27.) Nothing in the record suggests that the defendants recklessly disregarded the plaintiff's injuries or delayed in providing him treatment.

### III. Denial of Access to Court

The plaintiff claims loss of property — his "Legal Defense Arguments." (ECF No. 68 at 2.) The Supreme Court has explained that "even an intentional destruction of property by a state employee does not violate due process if the state provides a meaningful postdeprivation remedy." *Hudson v. Palmer*, 468 U.S. 517, 531 (1984). "New York state law provides [the plaintiff] with an adequate post-deprivation remedy here, i.e., § 9 of the Court of Claims Act." *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 499 (S.D.N.Y. 2014) (collecting cases). Section 9 of the Court of Claims Act vests the New York Court of Claims with jurisdiction over all claims "against the state for the appropriation of any real or personal property . . . or for the torts of its officers or employees while acting as such officers or employees." N.Y. Ct. Cl. Act § 9.

The plaintiff's claim can be read as a Fourteenth Amendment claim for denial of access to the courts. *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004); *see also Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001) ("Prisoners have a constitutional right of access to the courts, which is infringed when prison officials interfere with a prisoner's preparation of legal documents."). However, "[t]o state a claim of denial of access to the courts, an inmate must allege an actual injury" — conclusory allegations will not do. *Thomas*, 1 F. App'x at 54 (citing *Lewis v. Casey*, 518 U.S. 343, 349 (1996)). Moreover, "the appointment of counsel can be a valid means of satisfying a prisoner's right of access to the courts." *Bourdon*, 386 F.3d at 93.

There is no evidence that the plaintiff suffered an "actual injury" because his legal papers or arguments were lost. As an initial matter, the plaintiff does not say which defendant lost the papers. Indeed, the surveillance and bodycam footage does not show that any officer took the plaintiff's property, tampered with it, or destroyed it. The plaintiff does not explain how the loss

14

of these materials harmed him in connection with his criminal case, especially since he testified at his deposition that he was represented by counsel.  (ECF No. 70, Defs. 56.1 ¶ 77; ECF No. 71-5, Hall Dep. at 23.)  As a result, the defendants are entitled to summary judgment on the denial of access to court claim.

### IV.     *Monell* Claim

Finally, the Court interprets the complaint to assert a *Monell* claim for failure to train and failure to supervise.  (*See* ECF No. 68 at 8.)  However, the plaintiff cannot sustain a *Monell* claim because, as explained above, there was no constitutional violation.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.").  In any event, even if there were a constitutional violation the record does not support a *Monell* claim.

A *Monell* claim based on a failure to train requires a plaintiff to show "that a City's 'failure to train its subordinates . . . is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.'"  *Nelson v. City of New York*, No. 18-CV-4636, 2019 WL 3779420, at *16 (S.D.N.Y. Aug. 9, 2019) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)).  A municipality is deliberately indifferent when it knows "to a moral certainty that [it] would confront a given situation; the situation presented [it] with a difficult choice or there was a history of its mishandling the situation; and the wrong choice . . . would frequently cause the deprivation of plaintiffs' rights."  *Reynolds*, 506 F.3d at 192 (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).  While a single incident is generally insufficient to demonstrate liability, "a municipality can be found to be deliberately indifferent based on a single constitutional violation where the unconstitutional consequences of failing to train [are]

15

. . . patently obvious." *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 253 (E.D.N.Y. 2014) (citation and internal quotations omitted).

A plaintiff can sue a municipality under a failure to supervise theory where there is a "persistent failure to discipline subordinates who violate civil rights," that gives "rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct." *Nelson*, 2019 WL 3779420, at *16 (quoting *Batista v. Rodriguez*, 702 F.2d 393, 399 (2d Cir. 1983)). "[A] city's failure to train its subordinates satisfies the policy or custom requirement . . . where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds*, 506 F.3d at 192 (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)).

The defendants are entitled to summary judgment under either theory. There is no evidence that the City has a pattern or practice of failing to train corrections officers, including the officers in this case. Nor does the record show a "persistent failure to discipline subordinates who violate civil rights," *Nelson*, 2019 WL 3779420, at *16 (quoting *Batista*, 702 F.2d at 399), that would support a failure to supervise claim.[9] Accordingly the City is awarded summary judgment on the *Monell* claim.

## CONCLUSION

For these reasons, the plaintiff's motion for summary judgment is denied and the defendants' motion for summary judgment is granted. The Clerk of Court is respectfully directed to enter judgment, close this action, and mail a copy of this order to the plaintiff.

---

[9] The lawsuits and articles the plaintiff cites do not alter this analysis because the cases either do not exist or are distinguishable because they involve corrections officers who assaulted inmates or denied them medical care. (ECF No. 68 at 6–7.)

16

**SO ORDERED.**

                                                      s/Ann M. Donnelly
                                          ANN M. DONNELLY
                                          United States District Judge

Dated: Brooklyn, New York
        August 13, 2025